STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

11-106

STATE OF LOUISIANA

VERSUS

MARCUS W. ANDERSON

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 6611-08
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

**********

JAMES T. GENOVESE
JUDGE

**********

Court composed of Sylvia R. Cooks, J. David Painter, and James T. Genovese, Judges.

AFFIRMED.

John F. DeRosier
District Attorney – Fourteenth Judicial District
Carla S. Sigler – Assistant District Attorney
1020 Ryan Street
Lake Charles, Louisiana 70601
(337) 437-3400
COUNSEL FOR APPELLEE:
    State of Louisiana


G. Paul Marx
Louisiana Appellate Project
Post Office Box 82389
Lafayette, Louisiana 70598
(337) 237-2537
COUNSEL FOR DEFENDANT/APPELLANT:
    Marcus W. Anderson

**GENOVESE, Judge.**

Defendant, Marcus W. Anderson, appeals his two aggravated burglary convictions and his two forcible rape convictions. He does not appeal his sentences. For the following reasons, we affirm all four convictions.

### FACTS AND PROCEDURAL HISTORY

Defendant, Marcus W. Anderson, was charged by amended bill of information with aggravated burglary of R.G., a violation of La.R.S. 14:60; forcible rape of R.G., a violation of La.R.S. 14:42.1; aggravated burglary of J.S., a violation of La.R.S. 14:60; and, forcible rape of J.S., a violation of La.R.S. 14:42.1.[1] It is alleged in the record that Defendant entered R.G.'s dwelling on October 12, 2007, and raped her, and that he entered J.S.'s dwelling on October 16, 2007, and raped her.

Defendant was convicted by a jury on all counts of all offenses. The trial court sentenced Defendant to twenty years at hard labor on each count of aggravated burglary to run concurrently with each other. The trial court sentenced Defendant to thirty-five years at hard labor on each count of forcible rape to run consecutively to each other, but concurrently with the previously imposed aggravated burglary sentences.

On appeal, Defendant assigns the following errors:

1. The trial judge erred in allowing the testimony of R.G. in light of the fact that the identification was made from a photo line-up that was unduly suggestive.

2. The trial judge erred in allowing introduction of the photographs of R.G.'s vaginal area that had been altered or enhanced and therefore did not accurately illustrate that R.G. had been raped.

3. Considering the evidence in the light most favorable to the prosecution, the trier of fact could not have found the defendant guilty beyond reasonable doubt of forcible rape/aggravated

---

[1]In compliance with La.R.S. 46:1844(W), several names are replaced with initials to protect the victims' identities.

burglary of R.G.

4.   Considering the evidence in the light most favorable to the prosecution, the trier of fact could not have found the defendant guilty beyond reasonable doubt of forcible rape/aggravated burglary of J.S.

5.   The convictions in this case violate the Constitutional Prohibitions against Double Jeopardy because the same facts are relied upon for the Aggravated Burglary and the [Forcible] Rape.[2] The unlawful entry was enhanced to Aggravated Burglary by the commission of [Forcible] Rape, and as such there could not be additional punishment for the separate element of Aggravated Burglary. The effect was to impose two punishments for a single act.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent.

The trial court imposed sentences of thirty-five years at hard labor without specifying the number of years to be served without benefit of probation, parole, or suspension of sentence on each of the forcible rape convictions. The penalty provision for forcible rape requires at least two years of the sentence be imposed without benefit of probation, parole, or suspension of sentence. La.R.S. 14:42.1. Thus, the trial court imposed illegally lenient sentences; however, this court will not consider this issue as it was not raised as an error on appeal. *State v. Doucet*, 09-1065 (La.App. 3 Cir. 5/5/10), 36 So.3d 1105, *writ denied*, 10-1195 (La. 12/17/10), 51 So.3d 19. Additionally, the facts in the instant case trigger La.R.S. 15:301.1, which addresses the omission and provides in pertinent part:

A. When a criminal statute requires that all or a portion of a sentence imposed for a violation of that statute be served without benefit

---

[2]Defendant mistakenly referred to the conviction as aggravated rape.

2

of probation, parole, or suspension of sentence, each sentence which is imposed under the provisions of that statute shall be deemed to contain the provisions relating to the service of that sentence without benefit of probation, parole, or suspension of sentence. The failure of a sentencing court to specifically state that all or a portion of the sentence is to be served without benefit of probation, parole, or suspension of sentence shall not in any way affect the statutory requirement that all or a portion of the sentence be served without benefit of probation, parole, or suspension of sentence.

. . . .

C. The provisions of this Section shall apply to each provision of law which requires all or a portion of a criminal sentence to be served without benefit of probation, parole, or suspension of sentence, or of any one of them, any combination thereof, or any substantially similar provision or combination of substantially similar provisions.

**ASSIGNMENTS OF ERROR NUMBERS 3 AND 4**

Defendant asserts that considering the evidence in the light most favorable to the prosecution, the trier of fact could not have found Defendant guilty beyond a reasonable doubt of forcible rape/aggravated burglary of R.G. and of J.S.

"When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence." *State v. Hearold*, 603 So.2d 731, 734 (La.1992). Thus, we will first address Defendant's assigned errors regarding sufficiency of the evidence.

In *State v. Bourg*, 09-1291, p. 7 (La.App. 3 Cir. 6/30/10), 42 So.3d 1079, 1084, *writ denied*, 10-1702 (La. 2/4/11), 56 So.3d 990, this court explained in pertinent part:

The supreme court has discussed the standard [of] review [for] sufficiency of the evidence claims:

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational

3

trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

In *State v. H.L.J.,* 08-1070, p. 16 (La.App. 3 Cir. 4/1/09), 6 So.3d 997, 1007,

this court held in pertinent part:

Louisiana courts have previously discussed the extent to which a reviewing court may question credibility determinations made by the fact finder. "It is not the function of an appellate court to assess credibility. . . ." [*Macon*, 957 So.2d] at 1286. "The actual trier of fact's *rational* credibility calls . . . are preserved through the requirement that upon judicial review all of the evidence is to be considered as if by a rational fact finder in the light most favorable to the prosecution. . . ." [*State v.*] *Mussall* , 523 So.2d [1305,] 1311 [(La.1988)] (citing *Jackson*, 443 U.S. 307, 99 S.Ct. 2781). "[T]he actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *Id*. at 1310 (citing *Jackson*, 443 U.S. 307, 99 S.Ct. 2781). "In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the court, is sufficient to support a conviction or convictions." *State v. Stec,* 99-633, pp. 4-5 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787.

Louisiana Revised Statutes 14:60 provides in pertinent part:

Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,

. . . .

(3) Commits a battery upon any person while in such place, or in entering or leaving such place.

4

Louisiana Revised Statutes 14:42.1 provides in pertinent part:

> A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> > (1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

### *EVIDENCE RELATIVE TO R.G.*:

As to the sufficiency of the evidence regarding the convictions involving R.G., Defendant argues in pertinent part:[3]

> A review of the record reveals bizarre and weird information about R.G. and her inability to differentiate the real from the hallucinatory.
>
> Analysis can begin with the information related in the Sexual Assault Information form. . . . R.G. noted the following, to-wit:
>
> a) Suspect "yanked the phone wire out the phone"[;]
>
> b) Regarding "Penetration of Rectum by Penis" she stated "felt like it ripped my butt wide open"[;]
>
> c) Under medical history, present medications included klonopin, effexor, cogentin and geodon[;]
>
> d) Under last previous intercourse, "a Mexican raped me in the butt 3-4 months ago"[;]
>
> e) R.G. stated that she "made him a TV dinner I had"[; and]
>
> f) R.G. stated she gave him "150 for some kinda cigar[.]
>
> These statements are not corroborated. Nowhere in the record is there any testimony from the detectives or police investigators that the phone was torn off. Nowhere in the record is there any evidence or testimony that R.G. reported to any one [sic] the anal rape by a Mexican in June or July 2007. The alleged victim's testimony and recording of this information smacks of a delusional, hallucinating individual.

---

[3]References to the record contained within Defendant's brief have been omitted.

According to R.G., the defendant arrived at her apartment at 7:30 [p.m.] and sexually assaulted literally non-stop until 3:00 [a.m.] when she fixed him the "Hungry Jack TV dinner". Furthermore[,] the defendant stayed until 7:30 [a.m.] at which time she gave him money and he left. According to R.G., the defendant stayed 12 hours at her apartment. All of this makes little or no sense and the disjointed testimony of R.G. is incredulous, strange[,] and does not support a conviction.

We note that at trial, Defendant's attorney stated in pertinent part: "We are willing to stipulate that [R.G.] was assaulted. I will do that right now. We're just talking about who did it." However, on appeal, Defendant challenges whether or not the offenses occurred.

In *State v. Duvall*, 97-2173 (La.App. 1 Cir. 12/28/99), 747 So.2d 793, *writ denied*, 00-1362 (La. 2/16/01), 785 So.2d 838, the court was faced with a similar issue wherein the defendant attempted to present a defense both alternative to and inconsistent with the defense he presented in the trial court. The court held in pertinent part:

> Upon review, the supreme court [in *State v. Juluke*, 98-0341, pp. 4-5 (La.1/8/99), 725 So.2d 1291], reversed the Fourth Circuit, noting:
>
> > The *Jackson* standard also does not provide a defendant with a means of splitting alternative and inconsistent defenses in different forums, raising one defense before the jury and when that fails, a second defense [presupposing] a different set of facts in an appellate court conducting sufficiency review under *Jackson* and [La.Code Crim.P.] art. 821(E).
>
> [*State v. Juluke*, 98-341, pp. 4-5 (La. 1/8/99), 725 So.2d 1291, 1293].
>
> . . . .
>
> To permit him to argue the defense on appeal would violate the above holding of *Juluke* and allow him the unfair advantage of urging a defense that the State had no reason to challenge.
>
> . . . .

6

> Defendant's defense on appeal is inconsistent with the defense that he presented at trial because a defense that a shooting was committed in sudden passion or heat of blood is inconsistent with a defense that a shooting was accidental. In the former instance, an intent to fire the weapon exists, while in the latter instance, no such intent is present.
>
> . . . .
>
> For the foregoing reasons, the argument that the offense was manslaughter, rather than second degree murder, is not properly before this court and will not be considered.

*Id*. at 799-800.

In the instant case, at trial, Defendant's counsel stipulated to the rape and challenged the identification of Defendant as the offender. On appeal, Defendant's appellate counsel challenges whether or not aggravated burglary and forcible rape occurred. Thus, in accordance with *Duvall*, 747 So.3d 793, we find that this issue is not properly before this court and will not be considered.

Notwithstanding this court's ruling that the issue of insufficiency of the evidence is not properly before this court, we find that in reviewing the evidence in a light most favorable to the prosecution, sufficient evidence was presented to support the convictions of aggravated burglary and forcible rape.

At trial, R.G. testified that in October 2007, she was living on Giovanni Street in Lake Charles, in crisis housing, because she was homeless. R.G. stated that she suffered from mental illness including depression and bi-polar disorder. R.G. explained that she was currently being treated for bi-polar disorder at St. Patrick's Hospital. She acknowledged that she was on the medications Abilify, Klonopin, Cogentin, and Lithium. R.G. testified that on the night of October 13, 2007, around 8:00 p.m., she was sleeping on the couch in her apartment on Giovanni Street. At that time, she was not sharing the apartment with a roommate. R.G. recalled that she

7

checked to see that both windows and doors in her apartment were locked. R.G. testified that around 3:00 a.m., something awoke her. She saw a black man laying on the floor. R.G. was of the opinion that the offender broke the lock on one of the bedroom windows to gain entry. When she tried to get up to holler for help, the black male grabbed her by the throat and threatened to kill her if she did not do what he wanted. R.G. recalled she took off her clothes as instructed and got on the couch. The offender unzipped his shorts and took out his penis. He raped her vaginally. Following the rape, the offender said he was hungry, and R.G. fed him a TV dinner.

R.G. testified that after he finished eating, the offender raped her in the rectum. R.G. explained that he was hurting her, so she turned over; the offender complained and ". . . cummed [sic] on my arm . . ." R.G. testified that the offender fell asleep on top of her for a little while. Around 7:30 a.m., the offender asked R.G. for money to buy a cigar. When asked by the State, "Did you feel at any[ ]time while he was there that you could leave?," R.G. responded, "Uh-uh. I knew I couldn't leave. I was too scared and stuff, for one." R.G. testified that she believed he was going to kill her. R.G. explained that the offender did not cover his face at any time while he was in the apartment. After the offender left her apartment around 9:00 a.m., R.G. went to a friend's home and called the police.

At the police station, R.G. identified Defendant as the offender from a six-person lineup. Also, R.G. identified Defendant as the offender in the courtroom.

On October 14, 2007, R.G. was taken to Lake Charles Memorial Hospital for a sexual assault evaluation. Tammy Vincent, R.N., conducted the examination. Nurse Vincent testified that R.G. recounted details of the sexual assault. R.G. told Nurse Vincent that the sexual assault included vaginal penetration, rectal penetration,

8

and oral penetration on two occasions. R.G. informed Nurse Vincent that the offender was a black male named Chris from Westlake. Reading from her documentation of her examination of R.G., Nurse Vincent testified as follows:

> At this point in the examination is when I am talking to the patient about what happened to her, and I have asked her at this point to please let me know what she can recall happened, and this is what she told me. I documented that [the] patient states, (reading) "She awoke on her her couch and saw a black man laying on the floor beside my couch." She states, "I tried to get to the door to scream for help[,] but he grabbed me by the neck with his hands. He came through my window. I thought it was locked. I tried fighting him. It's not my fault. I was scared. He made me sit back on the couch. He made me take off my clothes. I told him I was on my period[,] but he still had sex with me anyway. He said, 'I'm going to kill you, bitch, if you don't have sex with me.' So, I got on the couch like he told me. It wasn't my fault. He said, 'I'm hungry. Get up and give me something to eat.' I was already scared of him, so I made him a TV dinner that I had. He made me get back on the couch[,] and he put it in my butt. I said, 'It hurts, please stop,' but he wouldn't. I laid on the couch. He laid right by me. I told him to leave. He wouldn't leave. I laid on the couch. He stayed until 7:00 or 7:30 this morning. Then he asked me for a $1.50 for some kind of cigar." She states that he assaulted her again before he left. "It really hurt[,] but I was scared. He said, 'If you don't [f---] me, I'm going to kill you.[']"

Nurse Vincent testified that R.G. had vaginal and rectal injuries. She explained that there were five tears at the vaginal opening, five tears at the anal opening, and five tears at the perianal area.

As part of the sexual assault examination, Nurse Vincent took blood samples and swabbings from under R.G.'s fingernails and her vaginal and rectal area. These items were turned over to law enforcement for storage and testing at the Southwest Louisiana Crime Lab.

Leann Suchanek, DNA Supervisor at the Southwest Louisiana Crime Lab, testified as to the results of the testing. Ms. Suchanek testified that from the swabbing of R.G.'s vaginal area, sperm cells were able to be extracted. The DNA testing revealed a mixture of two individuals, R.G. and Defendant. Ms. Suchanek

testified, "from the vaginal swabs[,] specifically[,] Mr. Anderson's DNA was present."

Peter Mahony, a psychiatrist, testified that he was treating R.G. at St. Patrick's Hospital for bi-polar disorder, mood symptoms, auditory hallucinations, and posttraumatic stress disorder. Dr. Mahony was of the opinion that R.G. was capable of testifying adequately about the rape that occurred in October 2007.

In the instant case, there is an absence of internal contradiction or irreconcilable conflict with the physical evidence. In fact, the physical evidence supports R.G.'s testimony, which was obviously accepted by the jury. Applying the *Jackson* standard, we find that sufficient evidence was adduced to support the convictions of aggravated burglary and forcible rape against R.G.

Accordingly, this claim lacks merit.

### *EVIDENCE RELATIVE TO J.S.*:

Defendant argues that the testimony of J.S. reflects that the sexual encounter was consensual and sets forth the following in support of his assertion:[4]

> a) J.S. met the defendant through a mutual friend during the daylight hours on October 15, 2007[,] while at her apartment[;]
>
> b) J.S. was a drug addict who smoked marijuana on a daily basis and abused prescription drugs to including [sic] Xanax;
>
> c) The defendant[,] at the request and bidding of J.S.[,] went to her apartment and sold her the illegal drugs;
>
> d) Twenty minutes after selling J.S. the illegal drugs, the defendant felt comfortable enough to return to J.S.'s apartment and engage in conversation with J.S.[,] which concluded when J.S. gave the defendant one Xanax pill;
>
> e) The defendant returned [to] J.S.'s apartment a "bunch of times", but no less than three times[,] and[,] at one point[,] J.S. provided

---

[4]References to the record contained within Defendant's brief have been omitted.

the defendant with a blanket;

f) J.S.'s roommate, [K.G.], shared drugs with J.S. on the evening of October 15, 2007;

g) Although the roommate's bedroom was located a mere [ten feet] from J.S.'s bedroom in this small apartment, [K.G.], a light sleeper, neither saw or heard anything that supports a violent act of rape occurring in the apartment;

h) The elapsed time for the entire encounter between the defendant and J.S. was ten (10) minutes;

i) The rapist placed on a condom before engaging in sexual intercourse with J.S.[,] and J.S. grabbed the defendant's penis to insure the condom was in place.

The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond reasonable doubt. **Jackson v. Virginia, 443 U.S. 307 (1979); State v. Wright, 730 So.2d 485 (La. App. 1 Cir., 1999)** Even under this onerous burden, it becomes clear that the testimony of J.S. is wanting and does not support a conviction.

The State would have the Court believe that J.S. experienced a brutal act of violence in the privacy of her apartment, screamed[,] yet no one heard her. In the tiny apartment with her roommate a mere [ten feet] from her bedroom door, yet no one heard. J.S. clearly had a "relationship" with the defendant as her drug dealer. She befriended him by engaging in conversation at her apartment door and ultimately giving him a blanket for warmth and comfort. However[,] the most telling aspect of this encounter that portends its consensual nature is the fact that, as any rational person engaging in sexual intercourse outside a monogamous relationship would do, the defendant took the time and had the consideration to place on a condom.

As is generally known, an act of rape is more an act of violent [sic] and brutality than a sexual act. Common sense dictates that it would be extraordinary for a rapist to have the courtesy and forethought to place on a condom when his intent is to violate and brutalize another human being. It is irrational to think that's how this sexual encounter occurred. It is understandable why J.S. would not want her roommate or anyone else to know that she engaged in sex with the defendant. However, logic, common sense[,] and sequence of events leading up to the sexual encounter command that the evidence in this case simply does not support a conviction for forcible rape/aggravated burglary.

11

J.S. testified at trial she was twenty-five years old. In October 2007, she and her roommate, K.G., shared an apartment on Giovanni Street. On October 15, 2007, she was at her apartment with K.G. J.S. had the day off from work. J.S. testified she discovered some items were missing from her apartment, which included a camera, her stash of marijuana, and a hundred dollar bill. J.S. admitted smoking marijuana every day. J.S. testified that, upon the discovery that items had been taken from her home, she went outside in front of her apartment and saw her neighbor, Bear. J.S. explained that Bear was friends with "Menou," who was also present. J.S. asked Menou if he saw anything regarding a break-in to her apartment. According to J.S., Menou denied seeing anything. J.S. testified she called the police, and the police came to her apartment. J.S. stated her camera was recovered from the corner store. J.S. recalled Menou had a friend with him, and they mentioned that the corner store would buy items from people who needed money. At trial, J.S. identified Menou's friend as Defendant.

J.S. testified she was upset over the burglary and asked Menou if he could get her a Xanax. According to J.S., Menou offered to have Defendant get J.S. the Xanax. J.S. recalled that twenty minutes later, Defendant knocked on her apartment door and had six Xanax pills with him. J.S. gave Defendant money for the pills and took one of the pills. J.S. stated she refused to let Defendant come into her apartment. J.S. testified that later on, Defendant knocked on her door and then her window. When Defendant knocked again, she answered the door, and he asked to sleep inside because it was cold. J.S. refused, but gave him a blanket. J.S. denied letting Defendant into her apartment.

J.S. testified she took one Xanax pill, and she and K.G. went to J.S.'s bedroom

to watch movies. After watching movies for a while, K.G. went to her bedroom. J.S. recalled both bedroom doors were closed. J.S. went to sleep around 2:00 a.m. The window unit air conditioner was on in J.S.'s room along with the TV. In K.G.'s bedroom, a box fan was on.

J.S. testified, while asleep, she felt her bed shift and felt something on her side pushing the bed. When she awoke, she saw a man straddling over her in her bed. When she saw him, she screamed, and the man grabbed her neck and held it tightly. J.S. testified the man entered through her bedroom window. She explained the window air conditioner unit must have been pushed out of the window.

J.S. testified she tried to scream and fight off the offender. She described pushing his eyes in his head with her hands and trying to push him off.

According to J.S., after a while of struggling, she told the offender she would stop screaming if he would wear a condom. J.S. testified the offender put the condom on with one hand while he held her throat with the other. J.S. explained that "after he put it on there[,] I grabbled it to make sure it was down there." J.S. testified that the offender pulled her shorts and panties to the side and penetrated her vaginally with his penis. J.S. testified the encounter lasted ten minutes. J.S. explained the offender then stopped and exited through the window. The State asked J.S. whether or not she had consensual sex with Defendant, and J.S. responded, "No, I did not."

After the offender exited the window, J.S. ran to K.G.'s room and "told her that the man that had been here earlier knocking on the door a bunch of times had came [sic] in the bedroom and raped me." J.S. testified K.G. called the police, and she went to the bathroom and threw up. The police responded to the call.

J.S. recalled that during the rape, the TV was on and that she recognized the

13

offender as the man that had brought her Xanax pills earlier that day. J.S. told the police the offender was one of the guys that was around her apartment when she reported the burglary. According to J.S., the man gave police his name when they were investigating the burglary. J.S. identified the offender as Defendant almost immediately from the six-person photo lineup presented to her at the police station following the incident. J.S. was then taken to the hospital for a sexual assault examination. J.S. later identified the offender as Defendant in court.

K.G., J.S.'s roommate, recalled the burglary and the police responding to the incident. K.G. testified she and J.S. were in their apartment watching movies in J.S.'s room. K.G. stated that J.S. had a window air conditioner unit in her room, and she had a box fan in her room. After watching movies for a while, K.G. returned to her bedroom. K.G. testified that, later on, J.S. opened up her door and was crying "hysterically" and told her she had been raped. K.G. testified J.S. was wearing a t-shirt and basketball shorts. K.G. recalled J.S. went to the bathroom and was throwing up. K.G. stated she called the police, although J.S. told her not to because the offender said he would kill them if they did.

K.G. testified that a black male she had met early that day came to the apartment, and J.S. bought Xanax from him. K.G. admitted taking part of one of the Xanax pills. K.G. also recalled that the black male had talked to the police about the burglary. K.G. was of the opinion that the black male was Menou. Then, the following pertinent exchange occurred:

Q    Okay. Where were you in the room? You answered the door.
What did you do after you answered the door?

A    I believe I went back to my bedroom.

Q    Okay. So, you didn't stick around?

14

A       No.

Q       Okay. Did you stop and have a conversation with the person who came to the door?

A       No.

Q       Did you stand there and look in his face and speak or say anything, smile at him? Did y'all talk?

A       I told him I would go get [J.S.] and shut the door.

. . . .

Q       Okay. So, when she went to the door, you weren't there?

A       No.

Q       So, you don't know who was at the door. Okay. You didn't actually see her exchange pills with Menou. He's the one who came initially when you answered it?

A       No, I did not.

K.G. did not recall if anyone had knocked on their door again.

When asked by the State whether J.S. had described who raped her, K.G. responded, "The man that was there earlier in the day that told the cops where our cameras were at." On cross-examination, K.G. testified that when shown a six-person photo lineup at the police station, she could not identify any of the suspects as the offender.

Takeisha Robertson, a detective with the Lake Charles Police Department, testified that she was involved in the investigation of the allegations of rape and aggravated burglary of J.S. As part of the investigation, Detective Robertson interviewed J.S. on October 16, 2007, around 7:00 or 8:00 a.m. Detective Robertson explained that J.S. advised her that the person that assaulted her was the person who was present at the investigation of the burglary. Defendant had given his personal

15

information to deputies at that time. Search and arrest warrants were issued for Defendant.

According to the detective, Defendant called the police station inquiring why they were looking for him. While the detective was on the phone with him, officers arrived at Defendant's mother's home and arrested him.

Nurse Vincent testified on October 16, 2007, a sexual assault examination was performed on J.S. by Carol Cunningham, R.N. Nurse Vincent testified Nurse Cunningham had moved out of the state. Nurse Vincent explained she was Nurse Cunningham's supervisor, and she had reviewed the report of J.S.'s examination. Nurse Vincent read to the jury the statement given by J.S. to Nurse Cunningham, stating in pertinent part:

> "I was sleeping and I was out. So, I felt someone touching me. Once I woke up and realized it was him, I started to struggle.' He said, 'Just give me what I want and I'll leave you alone.' And I started to scream for my roommate, thinking she would hear me. He told me he would choke me to death if I didn't stop screaming. He got on top of me and pulled my shorts to the side and I made him put on a condom." At this point[,] Carol Cunningham asked, "Where did he get the condom?" And she [replied], "He pulled it out and put it on. Then he proceeded for about ten minutes, stopped and jumped out the window."
>
> . . . .
>
> A    Yes. There is a notation that she made further down, and it says[,] on 10/15/07[,] at approximately 7:15 p.m.[, J.S.]'s apartment was broken into. [Defendant] was outside of her apartment prior to the break-in and after the break-in. [Defendant] came back to [the] apartment at approximately 10:00 to 10:30 p.m. and asked her to sleep on the couch. She gave him a blanket and told him he couldn't sleep at her apartment. She locked and bolted her door after he left.

Nurse Vincent testified the report indicated that J.S. had injuries to her neck, her left elbow, and her genital area, which was non-specific. Nurse Vincent explained that the injury to the genital area was classified as non-specific because

"[i]t shows that there is some redness and irritation to that area, which is not a normal finding, but it's not a specific finding." When asked whether or not vaginal penetration could be confirmed, Nurse Vincent explained in pertinent part:

A    Most women who have been sexually assaulted do not have any findings. Their exams are normal, and there are a lot of reasons that this would be normal. So, to say that sexual assault or sex occurred or not, when there is a lack of findings, cannot be said.

Q    Okay, I understand. But the purpose of, as we talked about yesterday, the purpose of this examination was to, since you can't necessarily confirm whether or not intercourse occurred, you can go ahead and try to, I guess, gather evidence for --

A    We can say that the injuries that are found on any particular patient can be consistent with their history. And, the findings on [J.S.]'s exam are consistent with her history.

. . . .

A    History of report of rape.

Swabbings for testing were taken from J.S.'s fingernails and genital and vaginal areas. Additionally, blood was taken for drug testing and DNA testing.

Ms. Suchanek testified that from the fingernail swabs taken from J.S., the DNA testing results by Southwest Louisiana Crime Lab indicated most likely two contributors, J.S. and Defendant. Ms. Suchanek clarified that the testing revealed that Defendant's DNA was found under J.S.'s fingernails. On cross-examination, Defendant's counsel asked if Defendant's DNA could have gotten under J.S.'s fingernails though the exchange of money and pills or through J.S. giving Defendant a blanket. In response, Ms. Suchanek testified, "There is a difference between minimal contact with it being on her fingers and actually under her fingernails. Under her fingernails probably would have been more of [sic] she would have had to actually have scraped something with her fingernails in order to transfer." The blood

17

test results from the toxicology screen indicated J.S. had marijuana and Xanax in her system.

In his brief to this court, Defendant concedes that he committed the act, but argues that it was consensual. Defendant bases this assertion on the fact that J.S. bought drugs from him, and she asked him to use a condom; however, Defendant fails to cite any case law to support that use of a condom necessarily equates with consensual sex. Furthermore, in the instant case, there is an absence of internal contradiction or irreconcilable conflicts with the physical evidence. In fact, the physical evidence supports J.S.'s testimony, which was obviously accepted by the jury.

Accordingly, we find that this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 1

Defendant argues that the trial court erred in allowing the testimony of R.G. in light of the fact that the identification was made from a photo lineup that was unduly suggestive. Defendant argues it was unduly suggestive because, before R.G. identified him from the photo lineup, she had seen him on television and in the newspaper as a suspect for another rape. Defendant complains that R.G. identified him six days after the incident occurred and that "her drug-induced mind [had] been influenced by the display of the defendant's photograph both on television and in the newspaper." Defendant further contends in pertinent part: "The defendant's picture on television and in the newspaper identified him as a rape suspect and for that reason and that reason alone, the defendant was placed in the photo line-up presented to R.G."

In support of his assertion, Defendant argues:

An out-of-court identification by a witness can be tainted by the viewing of a picture of the defendant broadcast on television and displayed in newspapers, if the identification itself is suggestive. **State v. Barnes, 592 So.2d 1352 (La. App. 5 Cir[.] 1991)**[.] Those are the facts here, with the witness seeing [Defendant]'s picture and a description of him as a rapist in a dramatic television news story. After that[,] it would have been surprising for her not to select him out of a photographic lineup.

At trial, R.G. acknowledged that she saw Defendant on TV before she viewed the six-person photo lineup. Then, the following pertinent exchange occurred between R.G. and the State:

Q    Okay. So, what I'm trying to understand[,] and I want you to tell the jury[,] is whether or not you saw his picture on TV and that made you think that was the person who broke in, or did you already know who he was?

A    No. I already knew who he was because he didn't have a mask or nothing on his face.

Additionally, Defendant's attorney cross-examined R.G. regarding the photo lineup and the following pertinent exchange occurred:

Q    Sure, okay. Well, [R.G.], and I'm just asking, do you think it's possible that you went through all of this horrible stuff[,] and then you saw this man's picture on TV accused of something else like that, and then that's why you thought that was the man? Do you think that's possible?

A    No, because, like I say, I recognized him. Even when he raped me[,] he didn't have on a mask or nothing. And, me, it don't take a hard time -- It don't take me a hard time, like I might forget your name at times, but I won't forget your face.

Defendant asserts the objection to the photo lineup at trial properly preserved the issue for appeal; however, Defendant did not file a motion to suppress the photo lineup identification by R.G. or seek suppression of R.G.'s testimony regarding the photo lineup. Additionally, at trial, Defendant did not object to R.G.'s testimony

regarding the photo lineup.

The first time Defendant's attorney objected was during the testimony of Detective Thomas Bell. Detective Bell, who was present when the photo lineup was presented to R.G. by Detective Robertson, testified regarding R.G.'s photo identification of Defendant. When the State offered the six picture photo lineup into evidence, Defendant's attorney asked for traversal of Detective Bell regarding the exhibit's authenticity. Defendant's attorney focused on selection of the photographs for the lineup and stated in pertinent part:

MR. COWARD:

> Judge, . . . I know Detective Bell was in the room, but since the other officer was the one that actually presented it to her, I think it would be more authentic if we could get that officer here to testify about how she presented this, if there was any sort of subconscious, you know, suggestion. I don't know if there was or not, Judge. We don't have the other officer here, so I'm going to object because of that.

The trial court overruled the objection. Then, the following pertinent exchange occurred between Detective Bell and Defendant's attorney:

> Q    So, . . . is that what your testimony is now that it would be changed to, that his name is in there because of your interest in him in another crime?

> A    In my report, sir, in [R.G.]'s case[,] she observed him on television and newspaper, and that's the reason why we took our time with her to make sure that she just didn't pick him out of television, and that's why we put it on our report. There was nothing hidden. We didn't try to hide anything.

> Q    Right. I'm not --

> A    Excuse me. That was the main thing why we did a six-pack[,] because we wanted -- The six-pack shows something different from TV and newspapers[,] and that's the reason why we really did the six-pack, because of that, to make sure that we didn't do any injustice to your client.

> Q    Sure.

A      To make sure she knew who raped her[,] and she was definite about it.

Q      Sure.  So, now, because of her identification from television or wherever, that's why he got in there.  He wasn't randomly put in the six-pack.  He was put in there by someone in your office because he was on TV and you wanted to see if that was him.

. . . .

A      The other rape happened a couple days after [R.G.]'s rape happened.  He was arrested on the 16th, the same day of that rape.  So[,] he was a suspect there in that same block of Giovanni in that same area; okay, and that's why the reason for the six-pack, sir.

Q      So that's why he's in the six-pack.  It's not random.

A      Well --

Q      The other five may be, but he is not randomly in there?

A      The sad part about it, your [client] was in the area for both rapes, sir.

On redirect, the detective explained having a suspect of a crime in a photo lineup is not out of the ordinary or improper.  Defendant's attorney objected again stating:

MR. COWARD:

Judge, just quickly, I want to renew my objection to the introduction of that last six-pack into evidence because[,] under further testimony[,] we got the detective to indicate my client is not included in there at random.  So, I think the procedure is going to be flawed because he's placed in there intentionally.  So, I object to it being introduced for that reason, Judge.

The trial court noted the objection.

In *State v. Boyance,* 05-1068, pp. 5-6 (La.App. 3 Cir. 3/1/06), 924 So.2d 437, 440, *writ denied*, 06-1285 (La. 11/22/06), 942 So.2d 553, this court held in pertinent part:

"A defendant who does not file a motion to suppress an identification, and who fails to contemporaneously object to the admission of the identification testimony at trial, fails to preserve the

issue of its admissibility as an error on appeal." *State v. Johnson*, 95-711, pp. 3-4 (La.App. 3 Cir. 12/6/95), 664 So.2d 766, 769, *writ denied*, 96-0082 (La.3/29/96), 670 So.2d 1236. *See also* La.Code Crim.P. arts. 703(F) and 841(A). The record reveals that the defendant did not file a pre-trial motion to suppress the witnesses' identifications or object to its admissibility at trial. Consequently, as the defendant failed to preserve this issue, we do not review it on appeal.

We find that Defendant's trial counsel did not properly preserve the challenge to R.G.'s testimony on the six-person photo lineup; thus, it is not properly before this court.

Moreover, even assuming the trial court erred in allowing the testimony, the error was harmless. R.G. identified Defendant in court, and the DNA testing of the swabbing of R.G.'s vaginal area indicated Defendant's sperm cells were present. Furthermore, Defendant's counsel thoroughly cross-examined R.G. and the detective regarding the photo lineup, and the jury was able to consider the cross-examination in their deliberation.

Accordingly, this assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 2

Defendant asserts that the trial judge erred in allowing the introduction of the photographs of R.G.'s vaginal area that had been altered or enhanced and, therefore, did not accurately illustrate that R.G. had been raped. Specifically, Defendant argues in pertinent part:[5]

> Tammy Vincent, R.N.[,] testified that she stained the skin of R.G. by applying toluidine blue dye. This alteration of the actual skin of R.G. highlighted and caused the area to stand out. Photographs of such an altered and enhanced image do not fairly and accurately depict the area of R.G.'s body as it was. Without the alteration and enhancement, Ms. Vincent admitted that it is possible that a person "would have a difficult time" seeing the purported injuries.

---

[5]References to the record contained within Defendant's brief have been omitted.

The probative value of a photographic [sic] can be outweighed by its prejudicial effect. **State v. Logan, 986 So.2d 772 (La. App. 5 Cir. 2008)**[.] In this case[,] the question is not whether the photographs are gruesome or abhorrent, but rather are the photographs a true image, the real thing, or are they altered or even doctored to look more or worse than is reality.

Under [La.Code Evid.] art. 401, these photographs were not relevant evidence. The proper standard is "whether the proffered evidence is relevant to any material issue in dispute and, if so, whether its probative value exceeds its probable prejudicial effect." [State v. Prestridge,] 399 So.2d 564, 573 (La. 1981)(citing [State v. Hawthorne], 345 So. 2d 1170 (La. 1977)). Under [La.Code Evid. art.] 403[,] these altered images should have been excluded, because "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of [unfair prejudice,] confusion of the issues, or misleading the jury[. . . .]"

The application of medical dyes to the object of these photographs made the impact on the jury much more dramatic than the actual pictures would have. The enhancements were prejudicial and the trial court erred in allowing them to be submitted to the jury.

At trial, during the testimony of Nurse Vincent, the State introduced the photos indicating vaginal and anal tearing. Defendant's attorney asked to traverse the nurse. The following pertinent exchange occurred:

Q    I haven't seen you in awhile. Ms. Vincent, on these photos[,] I noticed that -- I don't know the number. I guess we can count them. Some of them[,] but not all of them seem to have areas that are illuminated by purple dye. Did you talk about that a minute ago, a purple coloration?

A    It's blue dye.

Q    Blue dye?

A    It's toluidine blue dye.

Q    Okay. And that's something that y'all add at the hospital?

A    We add that after our initial examination, which is done just with the visible eye; and then[,] we take photographs with the colposcope before taking [sic] toluidine blue application; and then[,] we re-photograph again after the application.

Q      So these are post-application, I guess, because they all seem to have blue dye.

A      Okay.

Q      And the purpose of the dye is it sort of enhances so that people can see whatever injuries that you see; that's true?

A      Correct.

Q      Is that because the injuries are not really visible unless they're enhanced, at least in these photos?

A      No.  I can actually see those injuries before I add the toluidine blue dye.  That's how I know where to add the dye.

Q      Do you add it like with a little swab or something?  How is that added?

A      That's correct.  It's added with like a Q-tip swab.

Q      But you're testifying, I guess, that if you didn't add the dye, they wouldn't show up at least as well as they do in the photos without the enhancement?

A      They would show up, but[,] to the untrained eye[,] you would have a difficult time differentiating the injuries without someone instructing you where to look.

Q      So a layperson, everybody in the room but you, I guess, would have trouble seeing it without the enhancement?

A      That's possible.

Q      Possible, sure.  Are you able to tell how long these injuries have been in existence at all?  I mean can you go back a month, day, a year?

A      I can give you an approximate time.  Typically, general injuries will heal on their own within just a couple of days.  So, an injury to the extent that she has would probably not be visible at all after three days.

Q      And you said genital; did you also mean anal; is that true?

A      Correct, yes.

Q      And so[,] these photos you believe were taken within two to three days before she came and saw you?

24

A      Those injuries occurred within two to three days before she saw me, yes.

Q      That's what I meant to say.  These photos are of injuries incurred were [sic] within a couple of days before her visitation with you?

A      Correct.

Q      But you still felt it was necessary to enhance them a little bit to really make the injuries show; correct?

A      They show better on film once they're enhanced, yes.

Q      Okay.

MR. COWARD:

> Judge, I'm still going to make my objection.  I think they're going to be more probative -- excuse me -- more prejudicial than probative[,] and they're enhanced.  They're not pictures of what she actually saw.  They're pictures of what she saw after she enhanced it. . . .

Defendant's attorney reiterated that the injuries had been enhanced resulting in those particular photos being more prejudicial than probative.  The State responded that the photos were probative as they showed the exact injuries of the victim.  Then, the following pertinent exchange occurred:

THE COURT:

> Well, first, get me past why you think it's prejudicial. You've admitted that [R.G.] was sexually assaulted.  The photographs do nothing more than demonstrate a sexual assault. Your argument is based on identification of your client as being the person that was involved with it and has nothing to do with whether she was assaulted or not assaulted.  So, tell me where the prejudice is based on the defense that you have put forth at this time.

MR. COWARD:

> They put dye on the injuries, Judge.  It makes them look -- It makes them look -- I don't know if you've seen them.  It makes them look more heinous, worse, whatever the word may be, than they actually are, in my opinion. It says look, look, here.

THE COURT:

But you're claiming that your client did not do that.

MR. COWARD:

Well, that albeit, and so[,] when they see these pictures of these horrible injuries[,] they're going to say, "Oh, my God. This person had this terrible injury," which I believe is going to look worse just when the look [sic]. They're colored, and so I think it's going to unduly, subconsciously or not, reflect in their mind and they're going to have a prejudicial effect against [Defendant].

THE COURT:

First of all, Ms. Vincent, the SANE nurse, has indicated that her whole intent in preparing the report is for medical[-]legal presentation. It is noted that they are documented in detail. They are described in detail. They're photographed. Chain of evidence issues are maintained, and all of that is put forth.

On the timeliness, it was listed with regard to the report that you did receive a notice of the report, that there were some photographs that were taken. Now, it was also giving an opportunity for open discovery and an opportunity to either review them, if you felt that you needed copies, then to obtain those copies. I do not find that the fact that they are accented with blue dye to be prejudicial. In fact, I find it to be consistent with the whole intent of the SANE investigation to prepare and present evidence that laypersons can see and understand with regard to allegations that have been made.

. . . .

I don't find there to be any prejudice since the defendant has claimed that he did not do the assault, that it was not him, that he has been misidentified with regard to [R.G.] And, therefore, the issue that you've made with regard to credibility goes to the fact that she has to establish that there may have been a sexual assault, and they do establish, if in fact they show injuries, that the jury can, if they review those documents, find that some type of injury was received as a result of a sexual assault, and therefore goes to the credibility of [K.G.,] who has been challenged with regard to other issues, not necessarily the assault, but the identification.

So, I find the probative [value] to be greater than [the] prejudicial [value] under 403 definition of the Code of Evidence.

26

> I find that the photographs demonstrate what you are telling me they demonstrate for all purposes and intent is what they were intended to do. You have been involved in other sexual assault matters, are familiar with the use of a SANE nurse and what the intents of the SANE nurse would be, and why that evidence is presented in that medical[-]legal fashion for trial.

The trial court overruled the objection, and Defendant's attorney objected to the ruling. The photographs were introduced into evidence.

In *State v. Chesson*, 03-606, pp. 27-28 (La.App. 3 Cir. 10/1/03), 856 So.2d 166, 185, *writ denied*, 03-2913 (La. 2/13/04), 867 So.2d 686, this court explained in pertinent part:

> In *State v. Dunn*, 01-1635, p. 21-22 (La.11/1/02), 831 So.2d 862, 880 (citations omitted), the Louisiana Supreme Court explained the analysis for photographic evidence, stating:
>
>> The State is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove *corpus delicti*, to corroborate other evidence establishing cause of death, as well as location and placement of wounds, and to provide positive identification of the victim. Photographic evidence will be admitted unless it is so gruesome that it overwhelms jurors' reason and leads them to convict without sufficient other evidence.

We find that the introduction into evidence by the trial court of the dye-enhanced photographs at issue was not so gruesome as to unfairly prejudice Defendant's case. Furthermore, we find that the probative value of the dye-enhanced photographs, showing the injuries suffered by the victim, exceeded the prejudicial effect of same. Furthermore, even assuming the photos should not have been admitted, there was sufficient other evidence to support the conviction.

Accordingly, this assignment of error lacks merit.

**ASSIGNMENT OF ERROR NO. 5**

Defendant asserts that his convictions violate the constitutional prohibitions against double jeopardy because the same facts are relied upon to support the aggravated burglary and the forcible rape. Defendant argues that the acts in this case were directed at the rape, and there is no logical basis to separate the acts. Defendant states, "The force applied in the story presented by the State was directed to the accomplishment of the rape and was an essential element of the enhanced grade of the rape . . . ."

Defendant did not file a motion to quash on the basis of double jeopardy. Additionally, Defendant did not object on the grounds of a double jeopardy violation at trial. However, La.Code Crim.P. art. 594 provides: "Double jeopardy may be raised at any time, but only once, and shall be tried by the court alone. If raised during the trial, a hearing thereon may be deferred until the end of the trial." Thus, this claim is properly before this court. *State v. Cox*, 07-774 (La.App. 3 Cir. 3/4/09), 4 So.3d 998, *writ denied*, 08-602 (La. 9/4/09), 17 So.3d 948.

In *State v. Archield*, 09-1116, p. 4 (La.App. 3 Cir. 4/7/10), 34 So.3d 434, 438, this court set forth the tests to be applied when reviewing a double jeopardy claim, explaining in pertinent part:

> Both the United States and Louisiana Constitutions prohibit double jeopardy; the imposition of multiple punishments for a single criminal act. *See* U.S. Const. amend. V; La. Const. art. 1, § 15. *See also*, La.Code Crim.P. art. 591. Louisiana courts use two methods, the "Blockburger Test" and the "same evidence test", to determine whether double jeopardy exists. *State v. Williams*, 07-931 (La.2/26/08), 978 So.2d 895.
>
> In *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), the United States Supreme Court interpreted the Fifth Amendment's prohibition of double jeopardy and enunciated the following test to be employed by the federal courts, as follows:

28

The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of an additional fact which the other does not.

In interpreting Article 1, Section 15[,] of the Louisiana Constitution, Louisiana courts have also used the broader "same evidence test" which provides:

If the evidence required to support a finding of guilt of one crime would also have supported conviction of the other, the two are the same offense under a plea of double jeopardy, and a defendant can be placed in jeopardy for only one. The test depends on the evidence necessary for conviction, not all the evidence introduced at trial.

*State v. Cotton*, 00-850, p. 5 (La.1/29/01), 778 So.2d 569, 573, quoting *State v. Steele*, 387 So.2d 1175, 1177 (La.1980).

## *BLOCKBURGER TEST*:

Louisiana Revised Statutes 14:60 provides in pertinent part:

Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender,

(1) Is armed with a dangerous weapon; or

(2) After entering arms himself with a dangerous weapon; or

(3) Commits a battery upon any person while in such place, or in entering or leaving such place.

Louisiana Revised Statutes 14:42.1 provides in pertinent part:

A. Forcible rape is rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:

(1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.

In the instant case, there is no double jeopardy violation under the *Blockburger* test. Aggravated burglary requires the unique element of "unauthorized entering of any inhabited dwelling" whereas, forcible rape requires proof of the unique element of "sexual intercourse[.]" La.R.S. 14:60 and 14:42.1.

*SAME EVIDENCE TEST*:

Two issues arise in reviewing whether the "same evidence" for double jeopardy purposes was violated: (1) whether or not there is evidence to support the intent to commit a felony, the rape in this case (an element of the aggravated burglary), separate and apart from the evidence to prove the forcible rape; and (2) whether or not there is evidence of a battery separate and apart from the rape, to support the aggravated burglary.

In *State v. Lockhart*, 438 So.2d 1089, 1090 (La.1983) (footnotes omitted) (emphasis added), the court explained in pertinent part:

> In order to prove the crime of burglary, the State must prove beyond a reasonable doubt that the defendant made an unauthorized entry of a structure with the intent to commit a theft or a felony. *See State v. Cotton*, 341 So.2d 362 (La.1976); *State v. Searle*, 339 So.2d 1194 (La.1976) (on rehearing). *At the moment of the unauthorized entry, the actor must intend to commit a felony or theft therein. State v. Anderson*, 343 So.2d 135 (La.1977) (on rehearing). *See also State v. Marcello*, 385 So.2d 244 (La.1980).

In this case, the facts clearly reflect that Defendant entered the apartment with the intent to commit a felony, rape.

The State sets forth alternative felonies and a theft to support that required element of the aggravated burglary, stating in pertinent part:[6]

> Victim R.G. was also raped repeatedly, both anally and vaginally, and while one rape could constitute the forcible rape conviction, another could meet the felony required under the aggravated burglary statute.

---

[6]References to the record contained within the State's brief have been omitted.

The defendant also took money from R.G., and he committed simple criminal damage to property under [La.R.S. 14:56] when he removed J.S.'s air conditioner to enter her property. The taking of the money from R.G. was a theft, and the simple criminal damage was a felony; both are independent grounds to support the aggravated burglary convictions.

However, the record indicates R.G. gave Defendant $1.50 when he asked for money to buy a cigar, which would not support the elements of theft. La.R.S. 14:67. Additionally, J.S. testified that the window air conditioning unit was out of the window, but there was no testimony that the unit was damaged. Moreover, the State did not prove that the value of the window unit was greater than $500.00 in order to constitute a felony-grade offense, which is required under La.R.S. 14:60. *See* La.R.S. 14:56.

We have found no reported cases specifically addressing whether a double jeopardy violation occurs when Defendant is convicted of the felony and the intent to commit the same felony is used for a burglary conviction. However, in *State v. Solomon,* 379 So.2d 1078, 1079-80 (La.1980), the court implied no such violation, holding in pertinent part:

> Because the defendant plead guilty to the burglary charge, there is no trial transcript to review in order to determine whether evidence in the theft trial would be the "same evidence" to prove the burglary charge. We do have the testimony from the motion to quash which may be utilized for this purpose. Testimony of the arresting officers at the trial of the motion to quash set forth the facts on which the simple burglary charge was based. Their testimony establishes that the burglary and theft charges deal with the same incident of defendant entering Officer Bourgeois' vehicle on the night of November 28, 1978. Therefore, it can be determined that the exact same evidence is not required for a conviction of the defendant on both the burglary and theft charges because a conviction of burglary requires the additional proof of an unauthorized entry with the intent to commit a felony or any theft therein. R.S. 14:62. Furthermore, the two charges are not based on the exact same conduct as was the case in [*State v. Bonfanti*, 262 So.2d 504 (1972); *State v. Didier*, 263 So.2d 322 (1972)]. The crime of burglary was completed upon entry into the car with the intent to commit the theft

31

therein, whereas the theft did not occur until the defendant actually took the watch from the glove compartment. This distinction makes it clear that burglary of the automobile and the theft of the watch were two separate and distinct offenses and therefore, the conviction of one would not bar a conviction of the other on the grounds that the defendant would be placed twice in jeopardy for the same offense.

Additionally, in *Archield,* 34 So.3d 434, on appeal, the defendant challenged his convictions of aggravated rape and aggravated burglary on the basis of double jeopardy. This court found no double jeopardy violation wherein the intent to commit the rape and the conviction for the rape were not questioned, and no other facts were set forth to show that the defendant entered the house with the intent to commit a theft or any felony other than rape. This court held in pertinent part:

> The record supports the determination that in the present matter the crimes of aggravated rape and aggravated battery were separate and distinct offenses. The defendant could have been convicted of aggravated rape without proof that an aggravated burglary occurred. The evidence adduced through testimony showed that the defendant had non-consensual sexual intercourse with C.S.[,] and C.S. was prevented from resisting because the defendant threatened to kill her with the apparent power to execute that threat. La. R.S. 14:42(A)(2).

> Further, the defendant could have been convicted of aggravated burglary without proof that any rape occurred, considering that he committed battery upon C.S. by hitting, dragging and shoving her, after he forcibly gained entrance into the house. La. R.S. 14:60(3). Also, aggravated burglary could have been proven under the second aggravating factor of La. R.S. 14:60--when a perpetrator arms himself with a dangerous weapon after entering the inhabited dwelling. A dangerous weapon is defined as instrument "which, in the manner used, is calculated or likely to produce death or great bodily harm." La. R.S. 14:2(A)(3). A vase held over one's head in the manner presented in this case, arguably constitutes a dangerous weapon.

*Id.* at 440 (footnote omitted).

In *State v. Davis*, 09-1061 (La.App. 3 Cir. 4/7/10), 36 So.3d 351, the defendant was convicted of aggravated rape and aggravated burglary. On appeal, the defendant asserted a double jeopardy violation. Although this court did specifically address

32

whether the use of intent to commit the rape and the completed rape violated double jeopardy, it stated in pertinent part:

> In the current case, as in [*State v. Anderson*, 499 So.2d 1252 (La.App. 4th Cir.1986), *writ denied*, 503 So.2d 490 (La.1987)], *it was apparent from the facts that Defendant intended to commit a rape when he entered the trailer, a felony.* Further, the physical abuse constituted the battery element of aggravated burglary, and, as in *Anderson*, "[a]lthough the victim's beating fulfills one element of both crimes," the battery did not fulfill the distinguishing elements of each, i.e., the unauthorized entry and sexual intercourse.

*Id*. at 361 (emphasis added).

Considering the foregoing, we find no violation of double jeopardy under the same evidence test based upon the use of intent to commit a felony, the rape, and the completed act of the rape.

Moreover, in the instant case, R.G. testified that before the rape, Defendant grabbed her throat and choked her. Additionally, R.G. testified that Defendant threatened to kill her if she did not do what he wanted her to do, and he raped her.

We find that the evidence of the unlawful entry into R.G.'s apartment and Defendant choking R.G. were not necessary for a conviction of forcible rape. The crime of aggravated burglary was completed when Defendant entered the apartment, with the intent to commit a felony, and choked R.G. Additionally, the evidence showed that Defendant had non-consensual sexual intercourse with R.G., and R.G. was prevented from resisting because Defendant threatened to kill her with the apparent ability to carry out the threat. La.R.S. 14:42.1(A)(1). Thus, we find that the record supports the premise that the crimes of forcible rape and aggravated burglary were separate and distinct offenses. Therefore, there is no double jeopardy violation regarding crimes against R.G.

Regarding the crimes against J.S., she testified that when she woke up and saw

the man in her apartment, she screamed. J.S. stated Defendant reached for her neck, straddled over her, and began to choke her with both of his hands. J.S. testified in pertinent part: "I tried to fight him off, and I pushed his eyes in his head with both my hands because that's really all I could do, all I could see. Then, I tried to get him off of me and I could not." J.S. explained that Defendant was on top of her and stated, "He was pulling on my clothes and holding me down with one hand . . . ."

We find that the evidence of the unlawful entry into J.S.'s apartment, with the intent to commit a felony, and Defendant choking J.S. were not necessary elements for a conviction forcible rape. The crime of aggravated burglary was completed when Defendant entered the apartment and choked J.S. Additionally, the evidence showed that Defendant had non-consensual sexual intercourse with J.S. and that J.S. was prevented from resisting because Defendant held her down despite her efforts to fight him off. La.R.S. 14:42.1(A)(1). Thus, we find that the record supports the premise that the crimes of forcible rape and aggravated burglary were separate and distinct offenses. Therefore, there is no double jeopardy violation regarding the crimes against J.S.

## DISPOSITION

Defendant's convictions are affirmed.

**AFFIRMED.**