STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-395


STATE OF LOUISIANA

VERSUS

NATAJA SHERMAINE PORTALIS


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR 161705
HONORABLE ROYALE L COLBERT, DISTRICT JUDGE

**********

WILBUR L. STILES
JUDGE

**********

Court composed of Sharon Darville Wilson, Gary J. Ortego, and Wilbur L. Stiles, Judges.


**CONVICTIONS AFFIRMED. SENTENCES VACATED. REMANDED WITH INSTRUCTIONS.**

**Don Landry**
**District Attorney**
**Alisa Ardoin Gothreaux**
**Special Assistant District Attorney**
**Fifteenth Judicial District**
**P.O. Box 3306**
**Lafayette, LA 70502**
**(337) 654-0935**
**COUNSEL FOR APPELLANT:**
        **State of Louisiana**

**G. Paul Marx**
**Louisiana Appellate Project**
**P.O. Box 82389**
**Lafayette, LA 70598**
**(337) 237-2537**
**COUNSEL FOR DEFENDANT/APPELLANT:**
        **Nataja Shermaine Portalis**

**STILES, Judge.**

A jury convicted Defendant, Nataja Shermaine Portalis, of attempted second degree murder and aggravated battery following an incident in which a vehicle driven by Defendant struck and injured two victims. Although the trial court initially imposed concurrent sentences of ten years for attempted second degree murder and five years for aggravated battery, both to be served at hard labor, the trial court later granted Defendant's motion to reconsider. At resentencing, the trial court vacated the original sentences and resentenced Defendant to ten years at hard labor on each count, suspended, and three years of active probation, with special conditions. The trial court ordered that the sentences be served concurrently, but that the probation periods be served consecutively. Both Defendant and the State appeal. For the following reasons, we affirm Defendant's convictions but vacate Defendant's sentences and remand for resentencing.

## FACTS AND PROCEDURAL HISTORY

The underlying offense occurred in the early morning hours of April 23, 2017, when Defendant was in downtown Lafayette with a group of friends celebrating her boyfriend's birthday. The victims, sisters Clarissa and Mary Collins, were also in downtown Lafayette that night. One of the sisters had won a dance contest at a nightclub and a bouncer from the nightclub, Tyland Nerve, was escorting them to their cars. According to Nerve, anytime the nightclub awarded money for winning something, security would walk the winner to their vehicle. He noted that there had also been some conflict between the sisters and other women at the club who were upset about the result of the dance contest. At the same time, Defendant and her group were leaving a separate nightclub in the area. They were already in Defendant's car, with Defendant driving, when the Collins sisters passed by.

Defendant's sister, who was sitting in the back seat of Defendant's car, yelled something through the car window to Mary Collins, who became angry and struck Defendant's car with her hand while exchanging words with the occupants of the car. Her sister, Clarissa, pulled her away and they walked across the street towards a nearby alley.

Defendant drove to the entrance of the parking lot in which her car had been parked, turned left into the street, then quickly turned right, driving into the alley and striking both of the Collins sisters. Clarissa was hit and thrown to the side of the car. Mary, however, was pulled under Defendant's car and dragged down the alley before being run over by the car. Defendant never stopped her car and, instead, drove away from the scene. Both victims were transported to an area hospital for treatment. Clarissa had multiple abrasions. Mary had extensive injuries, including multiple abrasions, a deep laceration in her scalp, a half-centimeter depression in her skull, a broken arm, and multiple pelvic fractures.

An initial Bill of Information was filed on June 4, 2017, charging Defendant with two counts of attempted manslaughter, in violation of La.R.S. 14:27 and 14:31, and naming Clarissa Collins and Mary Collins as the victims. On December 10, 2018, the State amended the bill of information, charging Defendant with two counts of attempted first degree murder, in violation of La.R.S. 14:27 and 14:30, and again naming Clarissa Collins and Mary Collins as the victims. On November 30, 2021, the parties selected a jury for trial, which began hearing evidence the next day. On December 3, 2021, the jury unanimously found Defendant guilty of lesser-included offenses: attempted second degree murder of Mary Collins and aggravated battery of Clarissa Collins.

On June 13, 2022, the trial court denied Defendant's motions for a post-verdict judgment of acquittal and for a new trial. On the same date, the trial court sentenced Defendant to ten years at hard labor for attempted second degree murder and five years at hard labor for aggravated battery. The sentences were ordered to run concurrent with one another. Defendant filed a motion to reconsider sentence. On December 19, 2022, the trial court vacated the original sentences and resentenced Defendant to ten years at hard labor on each count, said sentences to run concurrent with one another. The trial court then suspended both sentences and placed Defendant on active supervised probation for three years on each count, with special conditions. The probation terms were ordered to run consecutively with one another, resulting in a total of six years of active supervised probation.

Defendant now appeals her conviction for attempted second degree murder, assigning a single assignment of error. The State also appeals the sentence for attempted second degree murder. We affirm Defendant's convictions; however, we vacate the sentences and remand to the trial court for resentencing.

**DISCUSSION**

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, this court reviews all appeals for errors patent on the face of the record. After reviewing the record, we have found four errors patent: one error patent regarding the sentence imposed for attempted second degree murder; one error patent regarding one of the conditions of probation; one error patent due to the trial court's failure to comply with La.Code Crim.P. art.

3

875.1; and one error patent due to the trial court's failure to advise Defendant of the time period for filing post-conviction relief.[1]

First, as for the sentence imposed for attempted second degree murder, the trial court decided the mandatory minimum sentence of ten years without benefit of probation, parole, or suspension of sentence was too harsh for this case. Thus, the trial court imposed a sentence of ten years, suspended, and three years active supervised probation. In its appeal, the State challenges the legality of the sentence imposed for attempted second degree murder. Thus, we address the legality of such sentence below as an assigned error.

Second, we find that the sentences imposed are indeterminate as the trial court failed to specify whether the 250 hours of community service was a condition of probation on one or both counts. After ordering Defendant to pay $25,000 in restitution to each victim, for a total of $50,000 in restitution, the trial court stated the following regarding community service:

> THE COURT: I think she needs to do a heavy amount of community service. And, I think she needs to see that, at a place where she can figure out that other people don't get the chance she got. So, I either want it done at a rehab facility, or at the Salvation Army.
>
> MR. BOUSTANY, III: Do you have the number of hours that you want, Your Honor?
>
> THE COURT: Two-hundred fifty. And that's it.

The trial court then clarified that the ten-year suspended sentences would be served concurrently, but the probation periods would be served consecutively.

---

[1] We note that the trial court imposed Defendant's original sentences at the same hearing that it denied her Motion for Post-Verdict Judgment of Acquittal and Motion for New Trial. Since La.Code Crim.P. art. 873 requires a delay of twenty-four hours between the denial of a motion for new trial and the imposition of sentence, there may have been a violation in this case. Since Defendant was resentenced six months later, however, we consider any error harmless.

4

We find that the trial court's imposition of 250 hours of community service without stating whether it applied to one count or both counts rendered the sentences indeterminate.[2] This court addressed a similar indeterminate sentence in *State v. Williamson*, 22-657, pp. 9-12 (La.App. 3 Cir. 4/5/23), 364 So.3d 572, 578-80, *writs denied*, 23-628, 23-643 (La. 11/8/23):

> The sentences imposed are indeterminate because the trial court ordered the payment of restitution "to the victim in this matter" without specifying to what count or counts the restitution order applied.
>
> . . . .
>
> In *State v. Pope*, 19-670, (La.App. 3 Cir. 6/10/20), 299 So.3d 161, *writ denied*, 20-852 (La. 10/6/20), 302 So.3d 532, this court found the trial court imposed indeterminate sentences when it failed to specify on which count or counts it imposed several terms of the sentence, including restitution. *See also State v. Duhon*, 20-513 (La.App. 3 Cir. 5/26/21), 322 So.3d 326, where this court found the defendant's sentences were indeterminate because the trial judge failed to state on which count or counts restitution was imposed.
>
> We further note that in *State v. Brown*, 19-771 (La. 10/14/20), 302 So.3d 1109, the supreme court announced a new rule concerning indeterminate sentences. The indeterminate sentence in *Brown* involved the trial court's failure to specify whether the concurrent, sixty-year terms of imprisonment for three counts of armed robbery with a firearm included the mandatory five-year sentence enhancement required by La.R.S. 14:64.3(A). The court of appeal vacated the sentences and remanded for resentencing; however, the supreme court found error by the court of appeal and stated the following regarding the purpose of La.Code Crim.P. art. 879's requirement that determinate sentences be imposed:
>
>> The court of appeal erred in finding the sentences were indeterminate as an error patent. The 1926 indeterminate sentence law provided that, except as to certain enumerated offenses, the sentence imposed should include both a minimum and a maximum term. *See* 2916 La. Acts 222. Under this law, after serving the minimum term of his sentence a prisoner was eligible for parole. To

---

[2] While the trial court did not specifically state that restitution and community service were imposed as conditions of probation, it did specifically state that it would "revoke" Defendant if restitution was not paid, thereby indicating that Defendant's probation was conditioned upon payment of restitution. It is reasonable to assume that community service was also imposed as a condition of probation.

remedy confusion over the correct interpretation and application of this law, Article 529 of the Code of Criminal Procedure was amended in 1942 to require determinate sentences of fixed terms of imprisonment. *See* 1942 La. Acts 46.

At present, [La.Code Crim.P.] art. 879 continues to require that a term of imprisonment be a fixed number of years by providing that "[i]f a defendant who has been convicted of an offense is sentenced to imprisonment, the court shall impose a determinate sentence." This article is routinely misapplied by the intermediate appellate courts to find determinate, fixed term sentences to be indeterminate when a district court has not specified that five years of a fixed sentence result from the firearms enhancement provision of La.R.S. 14:64.3(A). The intermediate appellate courts vacate such sentences in errors patent review. [Citations omitted.]

As a rule of thumb, however, if it is possible to calculate a parole eligibility or full-term release date, then the sentence is not indeterminate. While it is possible that defendant's sentences did not include the firearms enhancement and were therefore *illegally lenient*, they were not *indeterminate*. Furthermore, the State did not complain on appeal that the sentences were illegally lenient. Therefore, the court of appeal erred in finding as an error patent that they were indeterminate and in vacating them, absent any complaint by the State that the district court failed to apply the mandatory firearms enhancement.

*Id.* at 1110 (alteration in original)(emphasis in original).

*Brown*, however, does not address the problems that may arise in the present case if the sentences were allowed to remain as they were imposed. For instance, the trial court's failure to specify on which count or counts restitution is imposed could be problematic in the event one of the counts is vacated. Depending on which count is vacated, it may be unclear as to whether the restitution order is vacated as well. Additionally, in *Duhon*, 322 So.3d 326, this court found the sentences were indeterminate despite counsel's argument that the trial court's intent could be discerned from the record.

As this court did in *Pope* and *Duhon*, we hereby vacate the sentences imposed, remand for the imposition of determinate sentences, and specifically instruct the trial court to specify on which count or counts the restitution order applies.

We find that the present case is also distinguishable from *Brown*. In addition to the problem of not knowing to which count the community service hours would apply if one of Defendant's convictions were vacated, it is also unclear in this case whether the trial court intended for Defendant to complete a total of 250 hours of community service or complete a total of 500 hours of community service (250 on each count). The trial court stated that it wanted Defendant to complete a heavy amount of community service. The trial court further ordered the probation periods to run consecutively. Thus, the trial court may have intended for Defendant to complete 500 hours over the six-year period of probation. Since Defendant's failure to fulfill a condition of probation could result in the revocation of her probation, it is important for Defendant to be aware of the requirements.

Such an error typically requires that the sentence be vacated and the matter remanded for resentencing. As discussed below, we find merit to the State's assignment of error regarding the sentence imposed for attempted second degree murder, requiring that sentence to be vacated and remanded for resentencing. Thus, the error patent regarding the indeterminate condition of probation is moot as it pertains to the attempted second degree murder sentence. Since the State does not challenge the sentence imposed for aggravated battery, however, the error patent is not moot as to that sentence. Accordingly, we vacate the sentence for aggravated battery as indeterminate and remand the matter for resentencing on that count. If probation is imposed on one or both counts, we instruct the trial court to specify whether any conditions imposed apply to one or both counts.

The third error patent involves the newly enacted La.Code Crim.P. art. 875.1. The trial court ordered Defendant to pay $25,000 in restitution to each victim

(totaling $50,000) as a condition of her probation on each count. Louisiana Code of Criminal Procedure Article 875.1(C)(1) provides, in part:

> [P]rior to ordering the imposition or enforcement of any financial obligations as defined by this Article, the court shall conduct a hearing to determine whether payment in full of the aggregate amount of all the financial obligations to be imposed upon the defendant would cause substantial financial hardship to the defendant or his dependents.

Paragraphs B and G of 875.1 make it clear that the article applies to *any* fine, fee, cost, restitution, or other monetary obligation imposed as part of a criminal sentence or as a condition of parole or probation in a felony case. If the court determines that a substantial financial hardship would be created on either the defendant or his dependents, it can waive all or any portion of the obligation (we note that the victim must consent when restitution is involved) and order a monthly payment plan, half of which must be distributed toward a restitution obligation, if such were imposed. No such hearing was conducted in the present case. Since we are vacating both sentences in this case and remanding the matters for resentencing, we instruct the trial court to comply with the provisions of La.Code Crim.P. art. 875.1 should any financial obligations be imposed upon Defendant at her resentencing.

The fourth and final error patent involves the trial court's failure to advise Defendant as to the time period for filing post-conviction relief. Louisiana Code of Criminal Procedure Article 930.8 requires the trial court to inform a defendant at sentencing that he "has two years 'after the conviction and sentence become final' to seek post-conviction relief." *State v. Green*, 21-14, p. 4 (La.App. 3 Cir. 10/27/21), 329 So.3d 917, 921. Accordingly, we instruct the trial court to inform Defendant at her resentencing of the provisions of La.Code Crim.P. art. 930.8.

*Defendant's Assignment of Error*

In her sole assignment of error, Defendant argues that the trial court erred in denying her motion for a post-verdict judgment of acquittal as the State failed to prove her intent to murder beyond a reasonable doubt. If there was specific intent, Defendant argues that she was justified in attempting to defend the occupants of her motor vehicle, pursuant to La.R.S. 14:19. Defendant addresses only her conviction for attempted second degree murder in this assignment.

Louisiana Revised Statutes 14:19 states, in pertinent part:

> A.(1) The use of force or violence upon the person of another is justifiable under either of the following circumstances:
>
> . . . .
>
> (b)(i) When committed by a person lawfully inside a dwelling, a place of business, or a motor vehicle as defined in R.S. 32:1(40) when the conflict began, against a person who is attempting to make an unlawful entry into the dwelling, place of business, or motor vehicle, or who has made an unlawful entry into the dwelling, place of business, or motor vehicle, and the person using the force or violence reasonably believes that the use of force or violence is necessary to prevent the entry or to compel the intruder to leave the dwelling, place of business, or motor vehicle.

Defendant suggests that Mary Collins was attempting to stop Defendant's car and that Defendant herself believed people were trying to enter her car. She argues in her appellant brief that the use of force was justified to repel entry into her motor vehicle because "Mary was out of control," and further, that Mary "posed a threat, and it is unreasonable to assume that Nataja had any other intention but to leave the scene."

The evidence presented at trial indicated that Mary was angry and hit, slapped, or possibly even kicked Defendant's car. However, the testimony and evidence are clear that Mary had been pulled away from the conflict by Clarissa and/or Tyland Nerve by the time Defendant ran over Mary with her car. A witness, U.S. Army Staff

9

Sergeant Hunter Vige, recorded a ten second video clip of the incident which clearly shows the Collins sisters had walked away, separating themselves from Defendant's car. At the beginning of the clip, Defendant's car is seen turning into the street from the parking lot, and the victims are entering an alley across the street a few yards away. The car makes a left turn, then turns right and follows the Collins sisters into the alley. SSG. Vige testified that he stopped recording when he realized Defendant's car was going to strike the victims. He then dropped his phone and ran to help. SSG. Vige further testified that it was not necessary for Defendant to turn into the alley to leave the area because "when she made the left turn the street was open." A number of other witnesses also testified regarding the incident. None of them asserted that Defendant was under attack at the time she ran into the victims with her car, nor that the victims were trying to enter her car. The video clearly shows Defendant following the victims in her car, not the other way around.

Additionally, after reviewing Defendant's closing arguments at trial, we note that trial counsel made no assertion of justification in defense of Defendant's actions. We look to this court's discussion in *State v. Gilliam*, 14-228, pp. 4-6 (La.App. 3 Cir. 10/1/14), 149 So.3d 354, 357-58:

> This argument differs from Defendant's argument at trial which suggested that he possessed no gun at all. When presenting his case, Defendant put his mother on the witness stand, and she testified that "no one had a gun." Our brethren in the fourth circuit in a case involving La.R.S. 14:95.1 held:

>> [I]n evaluating a defendant's challenge to the sufficiency of evidence, we are restricted to those theories of defense actually put forward to the trier of fact. *See State v. Juluke*, 98-0341, pp.4-5 (La.1/8/99), 725 So.2d 1291, 1293-94 (per curiam). In other words, a defendant may not develop a new theory on appeal and demonstrate that the circumstantial evidence was insufficient to negate the new theory. *Id.*

10

*State v. Hamden*, 13-113, p. 10 (La.App. 4 Cir. 12/11/13), 131 So.3d 197, 203, *writ denied*, 14-51 (La.6/13/14), 140 So.3d 1188.

This court has also followed *Juluke*:

> We note that at trial, Defendant's attorney stated in pertinent part: "We are willing to stipulate that [R.G.] was assaulted. I will do that right now. We're just talking about who did it." However, on appeal, Defendant challenges whether or not the offenses occurred.
>
> In *State v. Duvall*, 97-2173 (La.App. 1 Cir. 12/28/99), 747 So.2d 793, *writ denied*, 00-1362 (La.2/16/01), 785 So.2d 838, the court was faced with a similar issue wherein the defendant attempted to present a defense both alternative to and inconsistent with the defense he presented in the trial court. The court held in pertinent part:
>
> > Upon review, the supreme court [in *State v. Juluke*, 98-0341, pp. 4-5 (La.1/8/99), 725 So.2d 1291], reversed the Fourth Circuit, noting:
> >
> > > The *Jackson* standard also does not provide a defendant with a means of splitting alternative and inconsistent defenses in different forums, raising one defense before the jury and when that fails, a second defense [presupposing] a different set of facts in an appellate court conducting a sufficiency review under *Jackson* and [La.Code Crim.P.] art. 821(E).
> >
> > [*State v. Juluke*, 98-341, pp. 4-5 (La.1/8/99), 725 So.2d 1291, 1293].
> >
> > . . . .
> >
> > To permit him to argue the defense on appeal would violate the above holding of *Juluke* and allow him the unfair advantage of urging a defense that the State had no reason to challenge.
> >
> > . . . .
> >
> > Defendant's defense on appeal is inconsistent with the defense that he

11

> presented at trial because a defense that a shooting was committed in sudden passion or heat of blood is inconsistent with a defense that a shooting was accidental. In the former instance, an intent to fire the weapon exists, while in the latter instance, no such intent is present.
>
> . . . .
>
> For the foregoing reasons, the argument that the offense was manslaughter, rather than second degree murder, is not properly before this court and will not be considered.

Id. at 799-800.

> In the instant case, at trial, Defendant's counsel stipulated to the rape and challenged the identification of Defendant as the offender. On appeal, Defendant's appellate counsel challenges whether or not aggravated burglary and forcible rape occurred. Thus, in accordance with *Duvall*, 747 So.2d 793, we find that this issue is not properly before this court and will not be considered.

*State v. Anderson*, 11-106, pp. 6-7 (La.App. 3 Cir. 6/1/11), 66 So.3d 568, 573-74, *writ denied*, 11-1493 (La.9/23/11), 69 So.3d 1167. In light of the foregoing jurisprudence, Defendant's new argument will not be considered.

For the reasons discussed in *Gilliam*, we will not consider Defendant's argument that she was justified in her actions. Her argument that any specific intent she may have exhibited during the incident was justified by her need to defend the occupants of her car was not raised at trial and is simply a new theory introduced by Defendant in an attempt to overturn her conviction on appeal.

Defendant also asserts in her assignment of error that the State did not adduce sufficient evidence at trial to prove she had specific intent to kill so as to support a conviction for attempted second degree murder. The test for sufficiency claims is well-settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

"Attempt" is defined in La.R.S. 14:27(A), which states:

Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

"Second degree murder" is defined in La.R.S. 14:30.1 as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" Thus, "a specific intent to kill is an essential element of the crime of attempted murder." *State v. Butler*, 322 So.2d 189, 192 (La.1975). As noted by the State in its appellee brief, La.R.S. 14:10(1) explains, "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." As such, "specific criminal intent need not be proven as fact but may be inferred from the circumstances of the case and actions of the defendant." *State v. Robertson*, 98-883, p. 6 (La.App. 3 Cir. 12/9/98), 723 So.2d 500, 504, *writ denied*, 99-658 (La. 6/25/99), 745 So.2d 1187.

13

The testimony of SSG. Vige indicated that Defendant stopped her car briefly at the entrance to the alley before moving forward and striking the Collins sisters:

> That was when I realized that someone was fixing to get run over because the two girls went into the alleyway, over there behind the bars. And, at that was like, at that point, I stopped recording, and I was running across the street. And, when I ran across the street, what happened was, was that like, the car pulled up to the person and it like, touched her. Then, it was like, there was a pause there. Then it was, I guess, a decision making process. And at that point, she accelerated over the first victim, and then, ran over the second one.

He specified later in his testimony, "And I watched, physically, the car touch the victims, stop, then run over her." Clarissa also testified that after Defendant turned her car into the alley, "[l]ike, she stopped, but when she stopped, we thought she was going to just back up and she was joking, but she just ran over us." Mary testified that as Defendant's car approached her in the alley, Defendant "looked at me" and "she was like, breathing in and out, and just went." When questioned further, Mary stated, "She stopped at my knee caps [sic]. Then she waited a few seconds. Then, that's when I move, and she pressed the gas." Such a pause or stop would suggest that Defendant did not simply speed through the alley in a panic without seeing the victims.

Elijah Francis was a passenger in the back seat of Defendant's car at the time of the incident. He testified that when Mary hit Defendant's car with her hand, Defendant "got mad." He later clarified that he didn't think Defendant ran over the victims "on purpose or nothing. She had got mad. It was like a reflex."

Gustavo Sanchez was employed as a police officer with the Lafayette Police Department the night of the incident. He was working patrol in downtown Lafayette

and witnessed Defendant hit the victims with her car. At trial, he described the incident as follows:

> As I stood on the corner, I was looking towards, I believe, it was Dat Dog restaurant, talking to the other two officers, when I saw or heard a commotion in the street, and as I turned my attention towards Dat Dog and the commotion in the street, I noticed a dark colored Nissan, all of a sudden take a hard right turn towards the alleyway behind Dat Dog, and as the car accelerated, I noticed a victim go up on the hood of the car. Then, the car accelerated at a high rate of speed down the alley, going the wrong way.

Officer Sanchez and another officer who was at the scene that night ran to check on the victims. Officer Sanchez testified:

> [W]e stopped to check on the victim [Mary Collins]. It did not look like she would survive. She was laying motionless on the ground. She had an arm - - I can't remember if it was the left or right arm, above her head; not in a normal arm shape. And, then, half of her scalp was ripped off the side of her head. Another officer took off; continued to run, trying to get a license plate off the vehicle, but again, the vehicle never slowed down, except to tap the brakes at the end of the alleyway.

Bryson Helaire, Defendant's boyfriend at the time of the incident, was riding in the front passenger seat of Defendant's car. He testified that once they were all in Defendant's car, Defendant's sister "Tot," who was sitting in the backseat, "put down the window and started yelling at the girls, or whatever. The girls ran up to the car and hit the window."[3] In response, Defendant "was going grab [sic] her taser" and "was gonna open the door, but she closed the door." Helaire then told Defendant "let's just go." At trial, Helaire was asked if the alley was a "necessary path" which Defendant needed to take to leave the area. He testified, "Not really. I mean, that's the way she chose to go." He further testified that after Defendant hit the victims with her car, he "looked at [Defendant]. I said, you know you killed them people,

---

[3] "The girls" referred to by Helaire are the Collins sisters.

huh? She looked at me, and she just kept going." Helaire then described the incident as follows:

> [MS. GOTHREAUX]:
> Do you remember the girl on the hood of the car?
>
> [HELAIRE]:
> Oh, the one - - yeah. Her, she was - - when she got hit, she must have been holding on, and when she went, she just was under the car.
>
> Q. Did you feel y'all roll over her?
>
> A. Yeah. I was trying to figure out why the car was jumping. So, when I opened my door and I looked, she come slide from under the car.
>
> Q. You saw her under the car?
>
> A. Right.
>
> Q. Okay. Was there any time or point in there that you remember that the Defendant stopped her car?
>
> A. Kind of slowed down.
>
> Q. Where?
>
> A. At the beginning, when she realized she hit them.
>
> Q. But, there was a dragging that happened. At what point did she slow?
>
> A. The dragging didn't happen until she really realized she hit somebody. Then, when I opened the door and I said, you know, you hit somebody? She just kept going.

When directly questioned about Defendant's intentions that night, Helaire acknowledged that he initially told the police officer during his interview that he didn't think Defendant meant to hit the victims. However, when pressed about his thoughts on the incident, he stated, "So, at the beginning, yeah, I could have said it was an accident. But, after a while, later on down the years, then no. I would have

16

to say it's intentional, because I would have stopped the car and checked on these people."

Another passenger in Defendant's car that night was Defendant's cousin, Dominiqua Mouton. During the incident, she was sitting in the backseat directly behind Defendant, next to the driver's side passenger door and to the left of "Tot"/"Totty", who was sitting in the middle of the backseat. Dominiqua testified that they were sitting in Defendant's car in the parking lot waiting for traffic to clear so they could leave. As the Collins sisters walked past the car, "Totty" leaned over, rolled down the window on the passenger side, and "told the girls, B, you not 'bout it." At that point, Mary became angry and "started charging towards the car." "Totty" then took out her taser, rolled down the window next to Dominique on the driver's side, and "stuck the taser through the window." Dominiqua rolled the window back up just as Mary hit the window. Tyland Nerve, identified by Dominiqua as "a tall, slim dude with a white tux[,]" picked up Mary and "took her away[.]" Dominiqua testified that she did not see the victims before Defendant's car hit them. She simply felt a "bump, bump" when Defendant "took off[.]" She further testified, however, that after she felt the bump, bump, "That's when Bryson opened the car door and he leaned back and he looked and he said, bae, you killed those girls. You rolled them over. And, she just kept going. That's when we came out the alley and went left." When asked if she thought Defendant meant to hit the victims with her car that night, Dominiqua stated, "She didn't mean to do it. She wouldn't do that."

Reginald Mouton was an Uber driver who was parked near the scene of the incident that night. Reginald witnessed the Collins sisters exchange words with the people in Defendant's car and saw Mary Collins hit the car. He testified, "[T]he ladies finally pulled the girl away from the car, and they walked across the street to

17

the alley here (indicating)." According to Reginald, Defendant's car "kind of followed out", then turned into the alley and hit the women. Although he did not testify directly as to Defendant's intent at the time of the incident, he did characterize Defendant's actions as "aggressive."

Nerve was the bouncer who was escorting the Collins sisters from the nightclub to their car the night of the incident. He was asked at trial, "When you saw the car's movement, what was your impression of what the car was doing?" Nerve testified:

> Going after. Like, you could tell it was going after. I knew the car was going after. When the car came out speeding, and picking up a high rate of speed, and going that way, the only thing that was like, - - I thought they would have been able to maneuver and move out the way fast enough, but it wasn't that. Then, at the time she was walking, she turned into the car instead of trying to run the opposite way. It's like, she didn't know the car was coming her way. Because, as you see in the video, she is walking and she turned. When she turned, the car already there on her. So, there is nothing you can do with a vehicle that's already speeding at a high rate.

Further in his testimony, Nerve stated, "But, the person that was driving knew that she had hit her. She knew it because she kept giving it gas, and didn't even stop. As she hit her, she took off."

Defendant argues on appeal that the jury was left to merely speculate regarding her intent at the time of the incident. As stated in *Robertson*, 723 So.2d at 504, however, intent "need not be proven as fact but may be inferred from the circumstances of the case and actions of the defendant." While various witnesses at trial related competing versions of the events that occurred prior to and leading up to the incident, *Kennerson*, 695 So.2d at 1371, provides, "It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the

appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review."

As discussed earlier, in her appellant brief, Defendant suggests that she was in fear because Mary Collins was aggressive and a crowd was nearby. We have determined that the justification argument is not properly before this court; however, even if we should consider a more general defense argument against intent, we find such an argument borders on speciousness. It is clear from the testimony and video evidence presented at trial that the Collins sisters had withdrawn from any earlier conflict with the inhabitants of Defendant's car by the time Defendant turned into the alley. Defendant and her passengers were inside a motor vehicle and on the street. SSG. Vige testified that they had a means of egress other than turning into the alley:

> [MS. GOTHREAUX]:
> When you're seeing her make that left turn, do you recall if there was a bunch of traffic impeding her pathway?
>
> [VIGE]:
> I mean, there was traffic in the road, but that turn was a clear decision.
>
> Q.    When you say that, what do you mean exactly?
>
> A.    I mean, that's like a very narrow alleyway. It's a delivery alleyway. That's where the trucks deliver to all the restaurants and all the bars right there. When she made that left turn, that street was open. It was a deliberate turn right because, I mean, the people were in the alleyway at that point.

In addition, when Helaire was questioned at trial whether it was necessary for Defendant to turn into the alley, he stated, "Not really. I mean, but that's the way she chose to go."

Although the record indicates there was a crowd nearby, it does not show that the crowd was advancing on Defendant's car. Nerve, who had no direct role in the earlier conflict, testified that he beat on the car's trunk only *after* the victims had

been hit in an effort to try to get Defendant to stop. The victim's friend, Marassa Deterville, is seen on the video presented at trial running toward the scene; however, it is not clear what her intentions were. There is no indication in the record that Deterville or the victims were armed at any point. Instead, there was testimony presented at trial that Defendant and/or her sister, "Tot"/"Totty", may themselves have been armed with tasers.

Based on all of the evidence and testimony presented at trial, we find that the jury could have rationally determined that there was no reason for Defendant to fearfully flee down the alley. Further, we find that the jury could rationally have concluded that Defendant deliberately followed Clarissa and Mary Collins into the alley with the intention of running them over with her car.

For the reasons discussed, we find that Defendant's assignment of error lacks merit.

*State's Assignment of Error*

In its sole assignment of error, the State maintains that the trial court erred in its resentencing of Defendant for attempted second degree murder by deviating downward from the statutory parameters set forth by La.R.S. 14:27 and La.R.S 14:30.1. The State contends that the Defendant's actions were "heinous, vicious, and without qualification" and that the record contains abundant evidence of Defendant's specific intent to kill Ms. Collins. The State asks that this court reinstate the original sentence of the trial court.[4]

Louisiana Revised Statutes 14:27(D)(1)(a) states, in pertinent part: "If the offense so attempted is punishable by death of life imprisonment, he shall be

---

[4] The State does not challenge the sentence for aggravated battery.

imprisoned at hard labor for not less than ten nor more than fifty years without benefit of parole, probation, or suspension of sentence." Second degree murder is punishable by life imprisonment. *See* La.R.S. 14:30.1(B). Defendant was thus subject to at least ten years in prison, without parole, probation, or suspension of sentence.

The supreme court has spoken at length regarding the separation of powers between the judicial and legislative branches in sentencing persons for criminal activity. *See, e.g.*, *State v. Dorthey*, 623 So.2d 1276 (La.1993); *State v. Taylor*, 479 So.2d 339 (La.1985); *State v. Sepulvado*, 367 So.2d 762 (La.1979). Notably, the legislature has the sole authority to determine and define a crime as well as the "prerogative to determine the length of the sentence imposed for crimes classified as felonies." *Dorthey*, 623 So.2d at 1278. *See also* La.Const. art. 3, § 1. The judiciary, in turn, is "charged with applying these punishments unless they are found unconstitutional." *Dorthey*, 623 So.2d at 1278. *See* La.Const. art. 1, § 20. A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, and is nothing more than the purposeful imposition of pain and suffering and is grossly out of proportion to the severity of the crime. *Dorthey*, 623 So.2d 1276.

Recognizing that constitutional framework, the supreme court has remarked that it is "apparent that the Legislature's determination of an appropriate minimum sentence should be afforded great deference by the judiciary." *State v. Johnson*, 97-1906 (La. 3/4/98), 709 So.2d 672, 676. Although the courts have the authority, "in the rare case," to declare a sentence falling within the statutory limits provided by the legislature excessive, "this power should be exercised only when the court is clearly and firmly convinced that the minimum sentence is excessive." *Id*.

In fact, a sentencing judge begins consideration of the constitutionality of a sentence with the presumption that a mandatory minimum sentence is constitutional. *Johnson*, 709 So.2d 672. A defendant may only rebut the presumption of constitutionality upon clearly and convincingly showing that:

> [he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.

*Id.* at 676 (quoting *State v. Young*, 94-1636 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 528 (Plotkin, J., concurring), *writ denied*, 95-3010 (La. 3/22/96), 669 So.2d 1223). *See also State v. Wilson*, 01-2815 (La. 11/22/02), 836 So.2d 2.

In the event the sentencing judge finds that clear and convincing evidence justifies the downward departure from the minimum statutory sentence, the sentencing judge "is not free to sentence a defendant to whatever sentence he feels is appropriate under the circumstances." *Johnson*, 709 So.2d at 677. Rather, the judge must impose "the longest sentence which is not constitutionally excessive." *Id.* The judge is therefore required "to articulate specific reasons why the sentence he imposes instead of the statutory mandatory minimum is the longest sentence which is not excessive under the Louisiana Constitution." *Id. See also State v. Gordon*, 96-427 (La. 5/10/96), 672 So.2d 669. Requiring the sentencing judge to "re-sentence a defendant in this manner is in keeping with the judiciary's responsibility to give as much deference as constitutionally possible to the Legislature's determination of the appropriate minimum sentence …." *Johnson*, 709 So.2d at 677.

While both *Dorthey* and *Johnson* involved review of sentences imposed pursuant to the mandatory penalties associated with habitual offender adjudications,

the supreme court has explained that its principles are not restricted solely to penalties associated therewith. *See State v. Fobbs*, 99-1024 (La. 9/24/99), 744 So.2d 1274. Rather, La.Const. art. 1, § 20 broadly provides "'the basis for extending the court's control over the *entire* sentencing process.'" *Id.* at 1275 (quoting *Sepulvado*, 367 So.2d at 766).

In this case, the trial court granted Defendant's motion to reconsider sentence and stated the following in resentencing Defendant:

> THE COURT: I am about to issue a decision. I don't want any outbursts. I want no hand-clapping, clapping, expressions of anything. First person that makes an expression, I'm going to ask my deputy that's sitting to the right of me, to put that person in handcuffs. This is one of those cases the Court has actually struggled with in trying to decide what is and what should not have been done. The good part about that is I have the fortunate ability of hind-sight, and have been sitting on the bench since then, and given the couple of cases which have come forward in the recent -- in the past nine months, under similar circumstances. I will point to one in particular, where a young man ran over another young man and paralyzed him from the waist down, and got less than what this young lady actually received. Having looked at -- again, it's whether the punishment fits the actual crime to the actual person, and that's what we have to decide; whether that the punishment she is receiving is strictly for the benefit of punishing somebody. Again, the case law says, or whether it serves some other interest. In this particular case, I don't find that the mandatory minimum, as it applies to this particular person only, fits the actual -- serves anybody's purpose, but to punish this person. It's not -- the ten years is not going to make the victims feel better. The ten years is not making the State feel better. The ten years is doing nothing to rehabilitate this young lady, who had no prior record. In fact, jail or prison is only crime university, so it would only enhance her ability to commit a crime. But, before then, she had none. But, the point of that, that specifically stood out in this particular case, and I wanted to make sure I saw the actual medical records was, whether or not she was actually pregnant when this incident occurred. And, she was. Now, without being labeled a chauvinist, I have no idea what a woman goes through when a woman is pregnant, but I do believe in science. And, the science does say that their body undergoes some hormonal changes. So, I think some leniency, in that particular matter, that should have been taken up; at least considered. I also, did not believe I had the ability to go below the mandatory minimum sentence at this time. But, having read the case law, and I am a student of case law, I find that I actually do. So, I am going to reduce that sentence significantly. I am actually

going to -- something that the State can actually live with, because, either we believe in rehabilitation and forgiveness, or we believe the strict punishment. That's just the way that is. I'm[sic] firmly believe, since sitting on this bench, in rehabilitation, otherwise, again, you're just locking people, and you're warehousing them, and that does no good to anybody. I just don't see in this girl's past, anything that will make me believe that she is a danger to society in the given future. I think she made a mistake. I think she panicked. I also think that the jury came back with the right decision. I just think the punishment is too harsh from the State, and the Legislature did not believe that there are cases where we can deviate below; that they would not have given us that authority. So, there was two charges in this case. I'm going to give her ten years on each charge, to run consecutive. I am suspending both of those sentences and place her on three years active supervised probation, on both charges to run consecutive, which is for a total of six years probation. I am going to institute some – don't get happy yet, because I believe she owes those victims some money; some reparations for their -- not their pain and suffering, but they both lost the opportunity, and they lost some jobs. And, I looked at the medical bills that they actually turned in, and the disfigurement bills that they turned in. I am going to order $25,000 per victim in restitution for a total of $50,000 restitution that I want paid at no less than $250 per month. She was in college at the time, so me telling her to get a GED is not necessary. I'm assuming she is taking some kind of anger-management class. I think an anger-management class is also -- if she has not taken one, is necessary.

MR. BOUSTANY, III: Yes, sir.

THE COURT: I think she needs to do a heavy amount of community service. And, I think she needs to see that, at a place where she can figure out that other people don't get the chance she got. So, I either want it done at a rehab facility, or at the Salvation Army.

MR. BOUSTANY, III: Do you have the number of hours that you want, Your Honor?

THE COURT: Two-hundred fifty. And, that's it. Anything else?

MR. BOUSTANY, III: The only question I have, Judge, is the suspended sentence -- the six years probation, run consecutive, no problem. But, on the suspended sentence, could we run the ten years, concurrently, because it would be the same as the mandatory minimum, as opposed to increasing it to twenty years?

THE COURT: As long as probation runs consecutive, I am fine with that.

24

MR. BOUSTANY, III: Yes, sir. So, the time will run concurrently, and the probation will run consecutively?

THE COURT: That's correct.

MR. BOUSTANY, III: Thank you.

THE COURT: Note the State's objection for the record.

MR. BEAL: Thank you, Your Honor. Anything else?

MR. BOUSTANY, III: No, Your Honor. Thank you.

THE COURT: Let her know that if that restitution is not paid, I will revoke her.

While the trial court ostensibly maintained the minimum ten-year term for attempted second degree murder, it suspended the sentence and placed Defendant on probation, a condition specifically prohibited by La.R.S. 14:30.1. Those circumstances, we conclude, equate to a downward departure from the legislatively prescribed sentencing requirements of La.R.S. 14:27 and La.R.S 14:30.1. *See Fobbs*, 744 So.2d 1274. *See also State v. Russell*, 98-2773 (La.App. 4 Cir. 5/10/00), 764 So.2d 93.

Yet, the trial court's reasons do not reflect it conducted the type of articulable analysis required under both *Dorthey* and *Johnson*. Accordingly, we vacate Defendant's sentence for attempted second degree murder and remand the matter for resentencing. Should the trial court find *Dorthey* and its progeny applicable at resentencing, consideration of the pertinent factors should be identifiable from the record. Additionally, any downward departure cannot include conditions that are specifically prohibited by statute. As mentioned above, a judge must impose "the longest sentence which is not constitutionally excessive." *Johnson*, 709 So.2d at 677.

**DECREE**

For the foregoing reasons, Defendant's convictions for attempted second degree murder and aggravated battery are affirmed.

Defendant's sentences for attempted second degree murder and aggravated battery are vacated. The case is remanded for resentencing.

At the resentencing hearing, should the trial court find *State v. Dorthey*, 623 So.2d 1276 (La.1993) and its progeny applicable, the trial court is instructed to develop the record to reflect consideration of the pertinent factors.

As to the conviction for attempted second degree murder, the trial court may not suspend the sentence or place the defendant on probation as this is prohibited by statute and would run afoul of the jurisprudence. *See* La.R.S. 14:27 and La.R.S. 14:30.1. The trial court is further instructed to comply with La.Code Crim.P. art. 875.1 prior to any financial obligations being imposed or enforced. Finally, the trial court is instructed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 at resentencing.

**CONVICTIONS AFFIRMED. SENTENCES VACATED. REMANDED WITH INSTRUCTIONS.**